UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                                      :

EXODUS PARTNERS, LLC,                :
                                                      :

        Plaintiff-Counter-Defendant,    :

                                                        :          04 Civ. 10239 (GEL)

        -v-                        :

                                                     :        **OPINION AND ORDER**

WALLACE COOKE and WALLACE & COREY  :
REALTY CORP.,                      
                                                         :

        Defendants-Counter-Plaintiffs.   :

                                                       :
----------------------------------------------------------------x

Silvia L. Serpe, Krantz & Berman LLP, New
York, NY, for plaintiff-counter-defendant.

Joseph E. Fleming, Joseph Fleming, Esq., P.C.,
New York, NY for defendants-counter-
plaintiffs.

GERARD E. LYNCH, District Judge:

      Plaintiff-counter-defendant Exodus Partners, LLC ("plaintiff" or "Exodus") sued

defendants-counter-plaintiffs Wallace Cooke and Wallace and Corey Realty Corporation

("defendants"), alleging breach of contract and breach of fiduciary duty. Defendants asserted

counterclaims alleging breach of two contracts and a breach of fiduciary duty by plaintiff. After

a seven-day trial, a jury returned a verdict rejecting both of plaintiff's claims and one of

defendants' counterclaims for breach of contract. The jury found for defendants on the

remaining counterclaims, however, awarding defendants $330,000 for plaintiff's breach of

contract and $380,000 for plaintiff's breach of fiduciary duty. Plaintiff now moves for judgment

as a matter of law on the counterclaims, for a new trial on the contract counterclaim, and for a

new trial or for a remittitur on the fiduciary-duty counterclaim. Both parties move for sanctions.

Plaintiff's motion for judgment as a matter of law will be denied in its entirety, and plaintiff's motion for a new trial or remittitur will be denied with respect to the fiduciary-duty claim. Plaintiff's motion for a new trial with respect to the contract claim will be granted in part; the Court will sua sponte order a remittitur to $90,000 on that claim. Plaintiff's motion for sanctions will be granted, and defendants' motion for sanctions will be denied.

## BACKGROUND

In May 2002, two young businessmen, Derrick Milam and John Cormier, created Exodus Partners, LLC, to provide consulting services to real estate investors who sought assistance in managing their assets. (P. Mem. in Support of Mot. for J. as Matter of Law ("P. Mem.") 2; Trial Transcript ("Tr.") 31.) At about that same time, a friend of Milam and Cormier, Sharon Joseph, introduced them to defendant-counter-plaintiff Wallace Cooke, a retired police officer who had experience in the real estate business and who owned four properties in the Bronx. In August 2002, after a series of informal business dealings, deciding it would be advantageous to combine Milam and Cormier's business-school training and investment-banking experience with Cooke's practical expertise in real estate management, Milam, Cormier and Cooke entered into a refinancing agreement (the "2002 Refinancing Agreement"), which set forth how they would together manage and invest the proceeds of a refinancing of Cooke's Bronx properties. (P. Mem. 3; P. Ex. 56.)[1]

---

[1] During trial, and to some extent in the post-trial briefing, both sides have referred interchangeably to the individual principals (Milam, Cormier, Cooke) and their various corporate entities (Exodus, Wallace and Corey Realty Corporation, etc.). (See, e.g., Tr. 1129, 1232, 1254.) Some of the written agreements between the parties similarly flip back and forth between references to the corporate entities and their principals. (See, e.g., P. Ex. 51.) For present purposes, it is unnecessary to be more careful than the parties themselves. It suffices to note that only Exodus, the entity, was named in the complaint, the counterclaim, or the verdict form. It is

In November 2002, the parties entered into a second written agreement (the "Compensation Agreement"), which set forth the compensation Exodus, Milam and Cormier would receive for their services in connection with the refinancing and sale of the Bronx properties.  (P. Ex. 6.)  That agreement provided that Milam and Cormier would receive a flat fee of $100,000 for their services upon completion of the refinancing, and that Exodus would receive four percent of the proceeds from the sale of the properties.  (Id. at 2.)  According to plaintiff, the parties also entered an oral agreement during the fall of 2002, according to which Exodus would receive an additional $100,000 above and beyond the payments contemplated by the Compensation Agreement.  (P. Mem. 5.)  Defendants dispute the existence of the oral agreement.  (Tr. 703.)

The closing on the refinancing took place in March 2003, and the proceeds from that transaction — about $1.4 million — were deposited into a Washington Mutual account.  (Id. 92-93, 1014.)  Milam and Cormier subsequently withdrew from the account the amount they believed they were owed in connection with the refinancing, that is, approximately $100,000 as contemplated by the Compensation Agreement, and $100,000 pursuant to the alleged oral agreement.  (Id. 1015.)

The following month, Milam and Cormier presented defendants with a document, the "Proposed Opportunity," that detailed Milam and Cormier's plans for future business dealings with defendants.  (D. Ex. K; Tr. 348-49.)  The document proposed the creation of a "wealth management business" based on real estate, which would, among other things, grow Cooke's

---

thus indisputable that any liability resulting from the jury's verdict attaches only to Exodus as an entity and not to Cormier and Milam as individuals.  The potential relevance of a distinction between Cooke and his corporation is discussed in Section I.B.1, below.

assets from approximately $3.5 million to more than approximately $14 million in a period of 8

years.  (D. Ex. K at 3.)   A primary component of the strategies proposed by Milam and Cormier

involved real estate exchanges pursuant to 26 U.S.C. § 1031.  (Id. at 9.)  This section of the

federal tax code allows a seller to defer payment of taxes on real estate that he or she exchanges

for real estate "of like kind."  26 U.S.C. § 1031; see Liant Record, Inc. v. C. I. R., 303 F.2d 326,

329 (2d Cir. 1962).  Milam and Cormier represented in the Proposed Opportunity that their

§ 1031 strategy posed "[n]o risk of loss for invested capital with Exodus Partners," adding, "you

don't lose."  (D. Ex. K. at 9.)

The Proposed Opportunity did not itself become a contract, but it led to the parties' third

written agreement, signed on June 5, 2003.  This contract, known as the Asset Management

Agreement ("AMA"), set forth how the parties would invest the proceeds from the sale of

Cooke's four Bronx properties.  (P. Ex. 51.)  Though the agreement refers to one of the parties as

"Wallace and Corey, Inc.," the parties agree that this was a typographical error, and that the

contract was between Exodus and one of Cooke's corporations, the Wallace and Corey Realty

Corporation (the "Realty Corporation").[2]  (Tr. 1286.)  At the time the parties signed the AMA,

they also amended the 2002 Refinancing Agreement, thereby creating the Amended Refinancing

Agreement (collectively with the 2002 Refinancing Agreement, the "Refinancing Agreements").

The parties agree that their contracts created a joint venture, which gave rise to mutual fiduciary

_____

[2] The AMA is rife with typographical errors, ambiguous wording and run-on sentences.
The first page, for example, describes the agreement as between Wallace and Corey Inc. and
Exodus Partners, LLC, whereas subsequent pages identify the parties as Wallace and Corey Inc.
on the one hand, and Milam and Cormier individually, on the other.  Seven of the contract's nine
pages mark it as a mere draft, and key provisions of the contract consist of unintelligible run-on
sentences.  (P. Ex. 51; see infra Part I.A.4.)

duties.  (Id. 1294-95.)

Under the AMA, defendants agreed to invest the majority of the proceeds from the sale of their Bronx properties to acquire, with Exodus's assistance, "like kind" properties through a series of exchanges pursuant to 26 U.S.C. § 1031.  (P. Mem. 3; P. Ex. 51.)  Exodus, in turn, agreed to serve as asset manager for any new properties purchased by defendants with those proceeds.  More specifically, the AMA required Exodus, inter alia, "to perform business development based on discussions with [the Realty Corporation,] such as finding, acquiring, financial packaging and marketing of 1031 Property"; and to adopt "a general oversight role to achieve asset preservation and wealth management, including legal, accounting, tax management, and financial planning, responsibilities for [the Realty Corporation's] Invested Amount [sic]."  (Id. at 3.)  Though plaintiff claimed at trial that Milam and Cormier were not property managers (Tr. 1244), the AMA expressly requires Exodus to assume "responsib[ility] for the daily management and performance of the 1031 Property, including all decisions concerning the day-to-day operation of each 1031 Property."  (P. Ex. 51 at 3.)  The agreement provided a minimum compensation to Exodus of $250,000 per year upon the acquisition of the § 1031 property.  (Id. at 5.)  The AMA also entitled Exodus, "during the term of the Agreement," to a "40% Carried Interest in the appraised value of the 1031 Property to be paid only upon exit." (Id.)

At the end of September 2003, the parties completed the sale of the four Bronx properties (P. Mem. 3; Tr. 92-93, 228), and Exodus received $320,000, representing four percent of the proceeds as contemplated by the Compensation Agreement.  (P. Mem. 5; P. Ex. 6; Tr. 93, 167, 1050.)  According to plaintiff, Exodus transferred those funds into the Washington Mutual

account that held the proceeds from the refinancing completed in March 2003.  (P. Mem. 5; Tr.

167, 1019.)  Cormier testified that Exodus deposited the funds into that account to ensure that all

of the parties would "have more money to pursue opportunities together" in their joint real estate

venture.  (Id. 1020.)  Milam and Cormier also withdrew funds from that account, however.

Having already removed approximately $200,000 in connection with the Compensation

Agreement and oral agreement, see supra, Milam and Cormier also removed, on behalf of

Exodus, an additional $200,000, which they transferred to an account held by a property

management business they had established, namely, Exodus Property Management.  According

to Cormier and Milam, they were entitled to remove this additional $200,000 from the

refinancing proceeds for their new business — indeed, they claim they could have withdrawn

even more —  because they had successfully completed a § 1031 exchange for Cooke, and were

thus entitled to $250,000 in compensation pursuant to the AMA.  (P. Mem. 15-16; Tr. 167-68,

1015, 1021, 1140, 1148, 1169, 1259-60.)

The AMA led to the purchase of two properties.  In October 2003, Cooke purchased,

with Exodus's assistance, a property known as the Caribbean Park Apartments in Plant City,

Florida.  (P. Mem. 4; Tr. 116.)  Some five months later, Cooke purchased — again with

Exodus's assistance — the Regency Square Apartments in Odessa, Texas.[3]  At approximately

the same time, the parties failed to close a third § 1031 exchange on a property known as South

Dade in Homestead, Florida.  (P. Mem. 4; Tr. 134-36; see also P. Ex. 25.)  Because the

transaction failed, Cooke was unable to reap the full tax benefits available under § 1031.  (Tr.

---

[3] There was no dispute at trial as to the fact that the parties complied with § 1031's
requirements.  See 26 U.S.C. § 1031; 29 C.F.R. § 1.1031(k)-1.

1247.)  The parties dispute the reasons for the transaction's failure, as well as the consequences.

(See D. Mem. in Opp. to P. Mot. and in Support of Cross Mot. for Sanctions ("D. Mem.") 4, 7-8;

P. Mem. 10-12.)  According to defendants, the failure of the South Dade transaction resulted in a

tax liability of $500,000.  (D. Mem. 7-8.)

For a variety of reasons — not the least of which was the failure of the South Dade

transaction — Cooke became displeased with Cormier and Milam's performance under the

contracts.  In addition to blaming Milam and Cormier for the failed South Dade transaction,

Cooke believed that Milam and Cormier were not properly managing the acquired properties.

At trial, Cooke and an employee of Caribbean Park Apartments testified that Milam and Cormier

neglected the properties' physical condition, hired irresponsible employees, mistreated

employees, related poorly to tenants, and failed to take steps to address unacceptably high

vacancy rates.  Cooke explained that he felt forced under the circumstances to attend to the

properties himself — physically and financially — despite Milam and Cormier's attempts to

exclude him from the properties' management.  (See, e.g., Tr. 488-93, 506-10, 652-57.)

Additional trouble arose out of the parties' conflicting understandings regarding the

ownership of Exodus.  Cooke believed that the parties had agreed that he would hold a one-third

share in Exodus and be one of its three principals.  (See Tr. 476, 589, 706.)  Thus, he believed he

was entitled to one third of the $320,000 payment to Exodus in connection with the sale of his

Bronx properties.  (See id. 589, 609.)  Cooke also believed that he was a one-third owner of

Exodus Property Management, and that he was entitled to half of that company's profits.  (See

id. 1169, 1176.)

Suspicious and dissatisfied, Cooke began an audit of Exodus in Spring 2004 and asked Exodus to stop performing its asset management services in connection with the Caribbean Park and Regency Square properties. (P. Mem. 4.) In July 2004, defendants formally terminated the parties' agreements with the assistance of counsel. (P. Mem. 4; P. Ex. 40.) Upon termination of the parties' relationship, Exodus removed $250,000 that remained in the venture's Washington Mutual account. (P. Mem. 17.)

Exodus filed suit against defendants on December 27, 2004, and amended its complaint on May 4, 2005, and on July 27, 2005.[4] The Second Amended Complaint ("Complaint") alleged breach of a partnership agreement, breach of contract, and breach of fiduciary duty, all premised on, inter alia, the termination by defendants of the parties' agreements, the exclusion of Exodus from the parties' business and joint properties, and defendants' refusal to provide Exodus with a full and formal accounting of the partnership dealings. Plaintiff also claimed that defendants had failed to provide plaintiff with the 40% interest in the Texas and Florida properties to which it was allegedly entitled under the AMA. (Complaint ¶¶ 47-71.) In response to the complaint, defendants asserted counterclaims, alleging that Exodus had breached its fiduciary duties, and that Exodus had breached both the AMA and the Refinancing Agreements. (Answer to Second Amended Complaint at 2-6; D. Portion of Joint Pre-Trial Order at III.)[5]

At trial, plaintiff focused on defendants' alleged breach of the AMA, which according to plaintiff also constituted a breach of fiduciary duty. In her summation, plaintiff's counsel asked

---

[4] The original suit named additional parties, including Wallace Cooke's son Corey Cooke. The additional parties were dismissed from the action before the case went to the jury.

[5] At various times, both parties also demanded an accounting. That issue was not submitted to the jury.

8

the jury to award plaintiff $600,000 in damages, which she claimed would provide appropriate compensation for defendants' failure to provide plaintiff with the 40% interest in the § 1031 properties.  (Tr. 1263-64.)

Defendants asked the jury to find a breach by plaintiff of both the AMA and the Refinancing Agreements, in addition to a breach of fiduciary duty.  During summation, defense counsel argued that defendants were entitled to $106,666.67, or one third, of the $320,000 payment paid to Exodus in connection with the sale of the Bronx properties; $100,000 to compensate them for the funds Exodus had taken under the alleged oral agreement, which defendants claimed did not exist; $250,000 in damages for Exodus's unauthorized removal of funds from the Washington Mutual account upon termination of the parties' relationship; $500,000 as compensation for the failure of the South Dade transaction; $90,000 in damages for unauthorized salaries taken by Milam and Cormier from the property management company; and $30,000 for a gift or loan that Milam and Cormier had provided to Sharon Joseph with Cooke's funds, without his consent.  (Id. 1230-31.)  The combined amount, $1,076,666.67, represented what defense counsel referred to as the "identifiable" or "know[n]" damages.  (Id.)

In addition to the "identifiable" damages, defense counsel asked the jury to return a portion of the funds paid by defendants in connection with the refinancing and sale of the Bronx properties.  According to defense counsel, Milam and Cormier had not properly done the work that would have entitled them (or Exodus) to their compensation for the work on the Bronx properties, and the jury should accordingly award defendants "whatever" portion of this money that would fairly compensate defendants for plaintiff's failure to properly perform its obligations.  (Id. 1230.)  Finally, defense counsel noted to the jury that defendants would later

seek an accounting from the Court to ensure that they received compensation for any other damages that they could not calculate at that time.  (Id. 1030.)

The jury rejected all of plaintiff's claims, and further rejected defendants' claim that plaintiff had breached the Refinancing Agreements.  The jury found, however, that plaintiff had breached the AMA, as well as its fiduciary duty to defendants.  The jury awarded $330,000 in damages for the contract breach, and $380,000 for the breach of fiduciary duty.

## DISCUSSION

I.   Judgment as a Matter of Law Under Rule 50(a)

Exodus asks the Court to grant judgment as a matter of law on defendants' breach-of-contract and breach-of-fiduciary-duty claims, arguing that there was a complete absence of evidence supporting the verdict against plaintiff on these issues.  The motion is completely lacking in merit, and will be denied.

Federal Rule of Civil Procedure 50(a) provides that where there is no "legally sufficient evidentiary basis" for a reasonable jury to find for a party on a particular issue, the court may resolve the issue against that party and may "grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."  A jury verdict should be set aside under Rule 50(a) only where there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture," or where there is "such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against him."  Kosmynka v. Polaris Indus., Inc., 462 F.3d 74, 79 (2d Cir. 2006) (citation and internal quotation marks omitted).  In applying this

standard, a court must not make credibility assessments and must view the evidence in the light most favorable to the nonmoving party.  See Gordon v. Matthew Bender & Co., 186 F.3d 183, 184 (2d Cir. 1999).

This standard is not met here, as the jury had ample evidence on which to base a preference for Cooke's version of the events in question.

A.  Breach of the AMA

1.  The $500,000 Tax Liability

Defendants argued at trial that due to Exodus's inadequate performance of its contractual duties under the AMA, Exodus failed to close the South Dade transaction.  As a result of the transaction's failure, defendants claimed, they were ineligible for the benefits available under 26 U.S.C. § 1031, and were forced to pay $500,000 in taxes.  Courts in New York and elsewhere have permitted damages awards based on similar theories, see, e.g., Alexsey v. Kelly, 205 A.D.2d 650, 651 (2d Dep't 1994); see also Logan v. D.W. Sivers Co., 141 P.3d 589, 596-97 (Or. App. 2006); Talerico v. Olivarri, 796 N.E.2d 1083, 1086-87 (Ill. App. 2003), and there was sufficient evidence in the instant case to support defendants' South Dade claim.

Cooke testified, for example, that Cormier and Milam failed to consult him regarding the specific criteria he would have to meet to buy the South Dade property (Tr. 516); that they delayed unnecessarily in completing the tasks necessary to close the deal before the deadline imposed by § 1031 (id. 518); that they failed to keep him informed — and in fact affirmatively misled him — regarding problems they were experiencing with the bank and the reason for the transaction's ultimate failure (id. 518-19); that they failed to prepare appropriate contingency plans (id. 519-21); that, without Cooke's knowledge or consent, they used Cooke's money to

11

work on separate business dealings at the very same time they were supposed to be ensuring the

closure of the South Dade transaction (id. 521-24); and that they ignored the advice of at least

one attorney by pursuing the transaction (id. 515).[6]  The jury was entitled to credit all of this

testimony, to conclude on that basis that Exodus failed to perform its duties under the AMA in

good faith, and to find that plaintiff's breach caused the $500,000 in damages.  Plaintiff's claim

that Cooke was not a credible witness is irrelevant for purposes of the Rule 50 motion.  See

Gordon, 186 F.3d at 184.

    None of plaintiff's arguments attacking defendants' South Dade claim warrant judgment

as a matter of law for Exodus.  As an initial matter, plaintiff's arguments rely heavily on Cormier

and Milam's testimony.  The jury was entitled, however, to find those witnesses not credible and

to disregard anything or everything they said.

    Plaintiff also relies heavily on a letter from Wachovia Securities informing Milam that

Wachovia had denied an application for a loan assumption.  (P. Mem. 10.)  The loan assumption

was, at least according to Milam, necessary for the completion of the South Dade transaction.

(See id., citing, inter alia, Tr. 132-37.)  In plaintiff's view, the letter clearly indicates that the

denial resulted from issues surrounding Cooke's creditworthiness, financial strength and

experience; therefore, plaintiff argues, "[t]here is no possible way in which a jury could find that

Exodus was to blame for the failure to close South Dade."  (Id. 23.)

---

[6] Plaintiff claims that the court improperly admitted hearsay evidence regarding the
attorney's view of the transaction.  Even if the testimony in question had been barred, however,
there was sufficient evidence to support a finding of liability based on the failed South Dade
transaction.

The letter is much more vague and ambiguous than plaintiff claims.  After noting various factors considered by the "Master Servicer" in making a loan-assumption decision, including not only creditworthiness and financial strength but also any "condition[] as Master Servicer shall determine in its reasonable discretion to be in the interest of the Trust," the letter concludes that "these requirements have not been met."  (P. Ex. 25 at 1-2.)  The jury need not have adopted plaintiff's interpretation of the letter, and indeed could have disregarded the letter's significance entirely based on its vague, sketchy explanation for the loan assumption's denial.

Plaintiff further asserts that Cooke's claim of $500,000 in tax liability is not credible, arguing that it is inconsistent with other evidence in the record.  Plaintiff also notes that defendants did not offer into evidence any tax returns or other documentation supporting the alleged payment of $500,000 in taxes; nor did defendants elicit testimony from Cooke's accountant on the matter.  The jury was entitled, however, to credit Cooke's testimony regarding his tax liability, as well as his explanation for what plaintiff considers an inconsistency.  (See, e.g., Tr. 568-69.)  In view of this testimony, it cannot be said that there was a "complete" absence of evidence supporting a finding for defendants on the tax-liability theory.  Kosmynka, 462 F.3d at 79 (citation and internal quotation marks omitted).  It was up to the jury, and not this Court, to determine whether the lack of corroborating documentary evidence should defeat defendants' claim.

Finally, plaintiff claims that even assuming defendants paid $500,000 in taxes as a result of the transaction's failure, that amount does not accurately reflect his damages; a successful § 1031 exchange, plaintiff contends, does not allow a taxpayer to avoid taxes entirely, but only to defer them until such time that the acquired property (or properties for which the acquired

13

§ 1031 property is subsequently exchanged in another § 1031 transaction) are sold for cash or otherwise disposed of in a transaction for which gain or loss is recognized under the relevant tax laws.  (P. Mem. 12; Tr. 77, 888, 998-99.)  See Am. Int'l Enter. v. FDIC, 3 F.3d 1263, 1265 (9th Cir. 1993).  Thus, plaintiff reasons, defendants would not have permanently retained the full $500,000 they allegedly paid in taxes even if the South Dade transaction had proven successful.

Plaintiff concedes, however, that under § 1031, Cooke could have "deferred" the taxes at issue for his entire life if the South Dade transaction had been successful, simply by retaining the property indefinitely.  (P. Mem. 23-24.)  Assuming Cooke intended to do so, and that he had already paid $500,000 as a result of the transaction's failure (which the jury was entitled to find), $500,000 marks a fair estimate of his damages.  Though there may be uncertainty as to whether Cooke actually would have retained the § 1031 property indefinitely — and therefore uncertainty as to whether he would have retained indefinitely the tax benefits of § 1031 — that uncertainty does not preclude, as a matter of law, the recovery of the amount claimed.  It is well settled that where the existence of damages is certain, uncertainty as to their amount will not bar recovery, provided the claimant provides a "stable foundation for a reasonable estimate."  Boyce v. Soundview Tech. Group, Inc., 464 F.3d 376, 392 (2d Cir. 2006) (citation and internal quotation marks omitted)).  Assuming, as the Court must, that the jury credited Cooke's testimony, a sufficiently "stable foundation for a reasonable estimate" of damages exists in this case.  See also id. ("[I]f a plaintiff has shown it more likely than not that it has suffered damages, the amount of damages need only be proved with reasonable certainty . . . . A person violating his contract should not be permitted entirely to escape liability because the amount of the damages which he has caused is uncertain." (citations and internal quotation marks omitted)); Slater v. Kane, 275

14

A.D. 648, 650 (1st Dep't 1949) ("The fact that there is an element of uncertainty as to the amount will not preclude a recovery if some reasonable basis for a determination of the amount exists."); cf. Raishevich v. Foster, 247 F.3d 337, 343 (2d Cir. 2001) ("When damages are at some unascertainable amount below an upper limit and when the uncertainty arises from the defendant's wrong, the upper limit will be taken as the proper amount." (citation and internal quotation marks omitted)).[7]

This is not to say that the precise amount actually awarded by the jury in this case can be justified under these principles.  The jury's calculation of damages presents a distinct issue that is best addressed as part of the Rule 59 inquiry.  See Part II.B.2, infra.  For purposes of the Rule 50 motion, however, plaintiff's arguments regarding the tax-liability question are clearly insufficient to entitle Exodus to judgment as a matter of law.

> 2.  The $90,000 salary

The jury also had sufficient evidence to conclude that Exodus, through its principals Cormier and Milam, breached the AMA by retaining compensation in excess of that contemplated by the agreement.  There is no dispute, for example, that Cormier and Milam transferred $200,000 from the Bronx refinancing proceeds to a separate account, that they used the $200,000 to set up a property management company, Exodus Property Management, and that they then withdrew at least $90,000 from the property management account as personal compensation.  (See, e.g., P. Mem. 22; Tr. 409-10, 1129-30, 1140-48.)  The jury could have

---

[7] Though plaintiff contests defendants' tax argument on multiple grounds, plaintiff has never questioned that defendants would have satisfied the numerous statutory and regulatory requirements for a like-kind exchange under 26 U.S.C. § 1031 if South Dade had successfully been acquired.  See 26 U.S.C. § 1031; 29 C.F.R. § 1.1031(k)-1.

reasonably concluded that Cormier and Milam were not entitled to this $90,000 payment for property-management activities because the compensation provisions of the AMA did not specifically authorize it.

Exodus argues that the entire $200,000 in question belonged to it because the money withdrawn was simply a portion of the $250,000 in annual compensation to which Exodus was entitled under the AMA.  "Instead of taking all of the $200,000 and putting it into their individual pockets as salary," plaintiff explains, Cormier and Milam "decided to use the $200,000 to set up a property management company."  (P. Mem. 22.)  Under this theory, because the full $200,000 withdrawn by plaintiff belonged to it as compensation under the AMA, there was nothing improper about taking a $90,000 salary from these funds.

Though plaintiff's version of events finds some support in the record, there was sufficient evidence for the jury to reject it.  The jury may reasonably have found, for example, that the AMA did not allow Exodus to take the $200,000 as compensation, because Exodus had failed to perform the contractual duties entitling it to its compensation, and/or because Exodus prematurely and improperly withdrew the "[a]nnual" compensation after less than six months' work.[8]  (See Pl. Ex. 51 at 5; Tr. 366-67.)  The jury thus may have reasoned that the $200,000 that

_____

[8] Citing Milam's testimony, plaintiff argues that the "uncontroverted" evidence proved that Exodus was entitled to the $250,000 compensation "after *one* of the § 1031 properties closed."  (P. Mem. 22 (emphasis added), citing Tr. 410.)  The jurors could read the contract for themselves, however, and they were not required to accept Milam's interpretation of its ambiguous language.  The relevant section provides: "Annual cash compensation: during the term of the Agreement (commencing upon acquisition of the 1031 Property): a minimum of [$250,000] . . . ."  (P. Ex. 51 at 5.)  Given that the term "1031 Property" is used elsewhere in the contract to refer collectively to *all* of the § 1031 properties acquired pursuant to the agreement (see, e.g., id. at 1-3), the jury may have reasonably found that Exodus was not entitled to its cash compensation until all the properties were acquired.  Moreover, even if the contract is read to authorize compensation in the event of a single § 1031 transaction, it need not be read to

16

was transferred belonged not to Exodus, but to defendants or to the joint venture, and thus had to be used, if at all, for the joint venture's expenses and investments.  On this understanding, Exodus breached the AMA provisions governing compensation by withdrawing $90,000 as additional personal compensation for Cormier and Milam beyond what the agreement provided.

This conclusion is bolstered by Cormier's testimony, which could reasonably be interpreted as conceding that the $200,000 transferred from the refinancing proceeds to create Exodus Property Management did not belong exclusively to Exodus or its principals, but also to Cooke.  Cormier testified, albeit somewhat reluctantly, that Cooke held an interest in the property management company (id. 1142-43), which was created with the $200,000 transfer (id. 1140).  This suggests that Cooke retained an interest in the $200,000.  If that is the case, of course, those funds cannot properly be described as compensation under the AMA belonging exclusively to Exodus.

Exodus's claim that the $200,000 represented a portion of its $250,000 compensation under the AMA is further undermined by the fact that plaintiff withdrew the $200,000 from an account holding the *refinancing* proceeds, which were not governed by the AMA.  (Id.)  Indeed, plaintiff's counsel emphasized to the jury that the agreement governing the refinancing proceeds was "very distinct and separate" from the AMA.  (Id. 1240.)  Thus, a reasonable jury could conclude that funds held in an account under the Refinancing Agreements should not have been taken as compensation pursuant to the AMA.[9]  Moreover, while plaintiff emphasizes testimony

authorize compensation *immediately* upon completion of the transaction, as opposed to at the end of the year.

[9] This is not to say that the jury must have found that plaintiff breached the Refinancing Agreements by transferring the $200,000 in question to Exodus Property Management; indeed,

that Cormier and/or Milam discussed the $200,000 transfer with Cooke (P. Mem. 16, citing Tr. 1169), the Court is unaware of any evidence that Cooke knowingly authorized the transfer as a form of personal compensation to the Exodus principals, as opposed to a transfer of funds into a management company to be controlled by all parties.[10]

Thus, the jury was fully entitled to conclude that Cormier and Milam breached their contract with defendants by taking personal compensation from the joint venture's resources without authorization, and that their effort to characterize these sums as part of the $250,000 payment they were arguably entitled to under the AMA was merely an after-the-fact rationalization.[11]

### 3.   Additional bases for the breach-of-contract verdict

In addition to arguing that plaintiff improperly withdrew $90,000 and caused defendants to incur a $500,000 tax liability, defendants also emphasized to the jury their claim that plaintiff

---

the jury's verdict establishes precisely the opposite. The jury was entitled to conclude, however, that while Cooke consented to the transfer of funds to a property management company, the transferred funds belonged to defendants or to the joint venture and could not fairly be considered a part of plaintiff's $250,000 compensation under the AMA. Thus, the jury could fairly reason that plaintiff breached its obligations to defendants not by transferring the funds to a different account under the name of the property management company, but by taking $90,000 in personal compensation from the property management company without authorization under the AMA or approval by Cooke.

[10] Plaintiff's argument that the $200,000 taken from the refinancing proceeds was merely part of its $250,000 compensation under the AMA is also arguably inconsistent with the fact that plaintiff has not sought to recover from defendants the additional $50,000 in AMA compensation to which, under its theory of the case, it is entitled.

[11] In suggesting that the $90,000 salary provided a reasonable basis for the jury's verdict, of course, the Court need not hold that the evidence compels such a finding, or that the Court finds this best view of the evidence. The Court merely holds that plaintiff has failed to meet the "very heavy burden" required to upset a jury verdict on a post-trial Rule 50 motion. <u>Norton v. Sam's Club</u>, 145 F.3d 114, 118 (2d Cir. 1998).

poorly managed the Regency Square and Caribbean Park properties.  A substantial amount of the trial testimony was devoted to this issue, and a reasonably jury could easily have found that plaintiff's management of the properties was inept.

Plaintiff attacks this theory and others on various grounds, arguing, for example, that defendants did not establish any damages resulting from the allegedly improper management of the properties.  But while defendants failed to quantify any damages from plaintiff's inadequate management, a jury could easily conclude that a failure to properly maintain residential property, hire or retain competent staff, and address unreasonably high vacancy rates – all of which the jury could have found if it credited defendants' witnesses – would damage defendants by reducing the rental income from the properties.   In any event, for purposes of the Rule 50(a) motion plaintiff's arguments are moot.  Given that sufficient evidence exists to support at least two of defendants' breach-of-contract theories, plaintiff's motion to enter judgment for plaintiff on the contract claim must fail.  Whether the jury properly calculated damages for the breach is a distinct issue, which will be addressed below.  See Part II, infra.

4.   The Mandatory Dissolution Provision

Plaintiff argues that defendants never sent Exodus a 30-day cure notice, which is, according to plaintiff, "a prerequisite to a mandatory dissolution of the Asset Management Agreement." (P. Mem. 21.)   The failure to comply with this prerequisite, plaintiff contends, precludes a finding of breach and warrants judgment as a matter of law for Exodus.

It is not surprising that plaintiff devotes little attention to this argument in its brief, given that the dissolution provision on which plaintiff relies is ambiguous and confusing at best.  Over half of the first section of the "Mandatory Dissolution" provision, for example, consists of a

19

single run-on sentence that is, to say the least, difficult to parse.[12]  Reading the provision as a whole, one might make a reasonable guess as to what the parties *intended* the agreement to require.  The jury, however, was not required to engage in such guesswork or to re-arrange the contract's wording so that it would conform to plaintiff's interpretation.  Not all reasonable interpretations of the parties' intent, moreover, would necessarily lead to the conclusion that they intended to require a cure notice in the circumstances present here.

The "Voluntary Dissolution" section, which is more clearly worded than the "Mandatory Dissolution" section, authorizes a party to "exit the Agreement" after the first twelve months "upon forty-five (45) days written notice."  (P. Ex. 51 at 5.)  The section need not be read as prohibiting termination without notice, however, in cases where one of the parties has already breached the contract.  In any event, plaintiff's argument for judgment as a matter of law is not premised upon a breach of this section by defendants.  (See P. Mem. 21.)

---

[12] The sentence reads:

> At the conclusion of the thirty (30) day period, the challenging party shall determine if the non-compliant party has sufficiently cured the problem and this determination shall not be unreasonably withheld, (b) in the event the venture disposes of more than ninety percent (90%) of the 1031 Property, (c) if [the Realty Corporation or Exodus] files for bankruptcy or reorganization or such a filing is made against [one of them] and not withdrawn within 90 days, (d) if [the Realty Corporation or Exodus] so elect[s] following the term of the Agreement for certain breaches, or (e) if required by law[.]

(P. Ex. 51 at 5.)

B.  Breach of Fiduciary Duty

    1.  The distinction between Cooke and the Realty Corporation

Plaintiff asserts that the evidence at trial regarding the alleged breach of fiduciary duty by Exodus pertained exclusively to an alleged breach of the duty owed to *Cooke* individually, and that there was "absolutely no evidence of any breach" of a duty owed to the *Realty Corporation*. (P. Mem. 24-25.)  Because the jury only found a breach of the duty owed to the Realty Corporation — and was not even instructed to consider whether Exodus breached a duty owed to Cooke — plaintiff now argues that Exodus is entitled to judgment as a matter of law on the fiduciary duty claim.

    Plaintiff forfeited this argument by failing to raise it when moving for a directed verdict at trial.  (Tr. 1091.)  See Doctor's Assocs., Inc. v. Weible, 92 F.3d 108, 112 (2d Cir. 1996). Though defendants do not expressly argue waiver in their opposition to plaintiff's current motion, this does not constitute a waiver on defendants' part, for the Second Circuit has made clear that a movant's failure to comply with Rule 50's procedural requirements may not be excused by the Court or waived by the parties.  See Bracey v. Bd. of Ed. of City of Bridgeport, 368 F.3d 108, 117 (2d Cir. 2004); Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1155 (2d Cir. 1994).

    It is in the interest of justice, moreover, to hold that plaintiff's argument regarding the distinction between Cooke and the Realty Corporation is waived.  If Exodus had raised its current objection during trial, the issue could have been addressed at that time, and the jury instruction might have been altered to expressly include a breach of fiduciary duty claim on behalf of both the Realty Corporation *and* Cooke.  Overturning the jury verdict based on

Exodus's current argument would reward Exodus for keeping silent on this issue during trial.

That is precisely the result courts have sought to avoid by adhering strictly to the rule that Rule

50 arguments must be raised during trial in order to be considered on a post-trial motion.  Cf.

Doctor's Assocs., 92 F.3d at 112 ("The perfectly defensible rationale for this [preservation]

requirement is to prevent[ ] a party who loses at trial from using a [Rule 50] motion as a trap

after it is too late for the winner of the verdict to cure any alleged deficiencies of proof."  (second

alteration in original) (citations and internal quotation marks omitted)).

In any event, even if Exodus had not waived the argument in question, the Court would

not find it persuasive.  It was clear throughout the trial that there was only one real party in

interest on the defense side, despite the fact that the parties and the Court occasionally referred to

the Realty Corporation as an entity distinct from Cooke.  The jury thus could have reasonably

concluded that there was effectively no difference between the two defendants.  The language of

the AMA provides some support to this view of defendants, because it creates rights and duties

belonging to Cooke individually despite the fact that the agreement is formally between two

companies. (See, e.g., P. Ex. 51 at 1, 4.)

2.  Bases for the fiduciary-duty verdict

The jury was entitled to find a breach of fiduciary duty based on (1) plaintiff's

withdrawal of $100,000 pursuant to an alleged oral agreement which, according to Cooke, did

not exist (Tr. 197, 1156-57); (2) the $30,000 in funds that plaintiff either loaned or gave to

Sharon Joseph, without Cooke's consent (Id. 337-38; 385, 510-13, 1139-41); and (3) Milam and

Cormier's withdrawal of $250,000 from the Washington Mutual account at the end of the

parties' relationship (P. Mem. 17).  Notably, the sum of these three figures is precisely the

amount awarded by the jury on the breach-of-fiduciary-duty claim.

Plaintiff argues that the "overwhelming evidence" demonstrated that Cooke "orally agreed to give Exodus an additional $100,000 payment for its work in connection with refinancing the [Bronx] properties." (Id. 26.) This is an argument for the jury, which rejected it. While a jury could have concluded, based on Milam and Cormier's testimony, that Exodus was entitled to the additional sum, there was also sufficient evidence to reach the opposite result, particularly if the jury did not find Cormier or Milam to be credible. Not only did Cooke flatly deny that he had entered into an oral agreement (Tr. 484), but Milam and Cormier gave arguably inconsistent explanations as to why Cooke had agreed to the additional payment. (Compare id. 197, with id. 1156-57.)

With respect to the $30,000 loaned or given to Sharon Joseph, plaintiff's principal argument is that "Cooke failed to prove that Exodus retained that $30,000 for itself." (P. Mem. 26.) That is irrelevant, however. The question is not whether Exodus kept the money, but whether Exodus breached the fiduciary duty it owed to defendants and caused damages of $30,000 by giving or loaning the money to a third party without Cooke's consent. There was sufficient evidence for the jury to answer that question in the affirmative. (See, e.g., Tr. 385, 510-13.)

Finally, there is no dispute that Cormier and Milam emptied the Washington Mutual account of its remaining $250,000 in funds upon the termination of the joint venture. (P. Mem. 17; Tr. 168, 1024.) Consistent with Milam and Cormier's testimony, plaintiff argues in its post-trial briefing that Milam and Cormier were entitled to that sum (and more) because they had previously transferred into the Washington Mutual account the $320,000 that they had earned

23

from the sale of the Bronx properties.   The $250,000 taken at the end of the parties' relationship, plaintiff argues, was merely a partial recovery of the amount Milam and Cormier were owed.  (P. Mem. 17.)

Though plaintiff's theory is plausible, the only evidence plaintiff cites in its support is the testimony of Milam and Cormier (P. Mem. 17, 26, 27), which the jury was under no obligation to credit.  Plaintiff does not cite to any testimony from Cooke acknowledging that Milam and Cormier had contributed their $320,000 to the joint venture or that they were entitled to drain the Washington Mutual account as repayment; nor does plaintiff cite to bank statements or other documentary evidence to support its theory regarding the $250,000 withdrawal.  Though the record contains evidence that Exodus transferred the $320,000 out of its bank account and into a separate account immediately after receiving the money, the second account was also an account held by Exodus.  (P. Ex. 50 at 58; P. Ex. 49 at 40; see also P. Mem. 15 n.3.)  Milam conceded on cross-examination that, at least at the time of the transfer in question, only he and Cormier had authority to access the second account.  Accordingly, plaintiff has failed to meet its heavy burden of demonstrating that it was entitled to the $250,000 as a matter of law.[13]

## II.   Motion for a New Trial or a Remittitur

A district court may grant a new trial under Federal Rule of Civil Procedure Rule 59 only if it concludes that the jury reached "a seriously erroneous result" or that "the verdict is a miscarriage of justice."  Manley v. Ambase Corp., 337 F.3d 237, 245 (2d Cir. 2003).  While a Rule 59 movant carries a significant burden, the Rule 59 standard for a new trial is less stringent

---

[13] If plaintiff took the $250,000 to offset the $320,000 it allegedly contributed to the venture, plaintiff would presumably still be owed $70,000.  Plaintiff did not seek that additional amount from defendants at trial.

than the Rule 50 standard for judgment as a matter of law in at least "two significant respects." Id. at 244.  One, a court may grant a new trial under Rule 59(a) even where there is substantial evidence to support the jury's verdict.  Id.  Two, a court considering a Rule 59 motion is free to weigh the evidence itself, and need not view it in the light most favorable to the party that prevailed at trial.  Id. at 244-45.  However, a trial court should only "rarely" disturb a jury's assessment of a witness's credibility.  Brewster v. City of Poughkeepsie, 447 F. Supp. 2d 342, 347 (S.D.N.Y. 2006).

In some cases, a remittitur provides an appropriate alternative to simply granting a new trial.  "Remittitur is the process by which a court compels [the party that prevailed at trial] to choose between reduction of an excessive verdict and a new trial."  Cross v. New York City Transit Auth., 417 F.3d 241, 258 (2d Cir. 2005) (citation and internal quotation marks omitted). The court may require such a choice "where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken," or "where the award is intrinsically excessive in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error."  Trademark Research Corp. v. Maxwell Online, Inc., 995 F.2d 326, 337 (2d Cir. 1993) (citation and internal quotation marks omitted).  Remittitur may also be warranted where it can be demonstrated that the jury awarded specific amounts of damages that were not supported by the record.  Id. (explaining that "[i]f it could be demonstrated that the verdict included any of [plaintiff's] unsubstantiated damages claims, the award would be by definition excessive," and remittitur would be appropriate).  In considering a Rule 59 motion in a diversity case, a court applies federal procedural standards; state law controls, however, with respect to questions of

substantive law, including questions regarding the excessive nature of a damages award.

Imbrogno v. Chamberlin, 89 F.3d 87, 90 (2d Cir. 1996).  Finally, though plaintiff here asks for a

remittitur only with respect to the damages for breach of fiduciary duty (based on its assertion

that only a new trial or judgment as a matter of law would be an appropriate remedy with respect

to the breach-of-contract claim), the Court is free to consider the possibility of a remittitur sua

sponte for any claim.  See Stoma v. Miller Marine Servs., Inc., 271 F. Supp. 2d 429, 433

(E.D.N.Y. 2003).

The Court will not disturb the jury's $380,000 award for breach of fiduciary duty.  A

close analysis of the record, however, reveals that the jury awarded certain damages for the

breach of contract without adequate support in the record.  The Court will therefore require a

$240,000 remittitur, bringing the breach-of-contract award to $90,000.  If defendants do not

accept the remittitur, they are entitled to a new trial on the breach-of-contract claim.

A.  Damages for Breach of Fiduciary Duty

The $380,000 that the jury awarded for the breach of fiduciary is evidently the sum of

three amounts discussed by defense counsel in summation: $100,000 for the alleged oral

agreement, $30,000 for the loan or gift to Sharon Joseph, and $250,000 for the appropriation of

funds at the termination of the parties' relationship.  The Court is confident that these figures

provided the basis for the fiduciary-duty award, because the evidence as presented would not

support recovery of these amounts on a breach-of-contract theory, and because there is no other

combination of identifiable damages claimed by defendants that would equal $380,000.

Furthermore, for reasons discussed above, see supra Part I.B, the Court finds that a

$380,000 award based on these three figures is neither "seriously erroneous" nor a "miscarriage

26

of justice." Manley, 337 F.3d at 245.  Nor is there any basis for a remittitur.  Of course, the

standard for granting a new trial or a remittitur is different in several respects from the standard

the Court applied in analyzing these figures for purposes of the Rule 50 motion.  Even under the

more relaxed standard, however, the Court reaches the same result.  Accordingly, plaintiff's Rule

59 motion with respect to the fiduciary-duty claim is denied.

B.  "Identifiable" Damages for Breach of Contract

During summation, defense counsel presented the jury with a detailed calculation of the

"know[n]" or "identifiable" damages.  (Tr. 1230, 1231.)  In addition to the three amounts

stemming from the breach of fiduciary duty, the identifiable damages included the following

three amounts, all allegedly arising from defendants' breach-of-contract claims[14]:

- $90,000 to compensate defendants for the "salary" withdrawn in connection with Exodus Property Management.

- $106,666.67 based on defendants' claim that they were entitled to one third of the $320,000 that Exodus received from the sale of the refinanced Bronx properties; and

- $500,000 to compensate defendants for the taxes they paid as a result of the failed South Dade transaction.[15]

For reasons explained in Part I.A.2, supra, there was more than sufficient evidence for the

jury to include the $90,000 figure as part of the award for breach of the AMA.  Again, the Court

---

[14] Plaintiff claims that defense counsel did not distinguish between damages stemming from breach of contract and damages stemming from breach of fiduciary duty.  The Court disagrees.  While defense counsel was not always explicit in differentiating the categories of damages, his arguments as a whole made sufficiently clear to the jury which amounts stemmed from which breach.

[15] Despite extensive trial testimony on plaintiff's alleged mismanagement of the Regency Square and Caribbean Park properties, the "identifiable" damages discussed in summation did not include any damages resulting from the alleged mismanagement.

acknowledges that the standards under Rules 50 and 59 differ; the analysis in Part I.A.2, however, applies with equal force to plaintiff's Rule 59 claim.  Accordingly, the Court will not disturb the damages award for breach of the AMA to the extent it included this $90,000.  The additional amounts claimed, however, require further analysis.

### 1.  The $106,666.67

Defendants sought $106,666.67 based on their claim that Exodus breached the Refinancing Agreements.  (Tr. 1226, 1229).  Because the jury found that Exodus had not breached those agreements, the $106,666.67 could not properly have been factored into the total damages award.[16]  Defendants implicitly concede this point by failing to argue in their opposition brief that the $106,666.67 could form part of the amount awarded.  Cf. Atkins, 143 F.3d at 103 ("Having failed to raise this argument in opposition to the Rule 59 motion and to demonstrate [ ] that any interest of justice would be served by considering [it], appellees have waived the argument." (first alteration in original) (citation and internal quotation marks omitted)); Anti-Monopoly, Inc. v. Hasbro, Inc., 958 F. Supp. 895, 907 (S.D.N.Y. 1997) ("[T]he failure to provide argument on a point at issue constitutes abandonment of the issue.").

### 2.  The $500,000 in tax liability

As discussed above, see supra Part I.A.1, defendants sought $500,000 as part of their damages for plaintiff's breach of the AMA, claiming that Cooke paid that amount in taxes as a direct result of Exodus's failure to close the South Dade transaction.  For reasons already explained, the jury was entitled to credit Cooke's testimony on this issue.

---

[16] Defendants also suggested that Cooke was entitled to this $106,666.67 pursuant to the Compensation Agreement, but the jury was not asked to consider whether Exodus breached that agreement.

Given that the total damages award for breach of the AMA was only $330,000, however, it is beyond dispute that the jury did not actually accept the tax-liability argument as presented. (See D. Mem. 8 (acknowledging that if the jury fully took into consideration the damages claimed by defendants for the failed South Dade transaction, "the award would have been much larger," and noting that "[t]he award appears to take into consideration the other elements of damages testified to by Cooke"). To the extent the jury credited the tax liability argument, it appears to have discounted the damages below the total amount defendants claimed Cooke was forced to pay. While there may have been a reasonable evidentiary basis, for reasons explained above, to support a $500,000 award, this does not necessarily mean that the evidence provided a basis on which to award a substantially lower amount.

Having reviewed the record, the Court agrees with plaintiff that there was a complete absence of evidence that would provide a jury with any reasonable basis to set the damages award for the failed South Dade transaction above zero dollars but below $500,000. To award any amount in between zero and $500,000 would require the jury to reject defendants' (and plaintiff's) calculation of damages and to then engage in pure guesswork as to what defendants' damages truly were. New York law does not countenance damages awards based on such rank speculation. See Trademark Research Corp., 995 F.2d at 334. While a verdict need not reflect mathematical precision, there must be some minimally reasonable evidentiary foundation on which the jury could have rested its estimate of the damages awarded. See Boyce v. Soundview Tech. Group, Inc., 464 F.3d 376, 391-92 (2d Cir. 2006); Trademark Research Corp., 995 F.2d at 334; see also Ashland Mgmt. Inc. v. Janien, 82 N.Y.2d 395, 403 (1993). The only evidence regarding damages for the failed South Dade transaction was Cooke's testimony, which set the

amount at $500,000; nothing in the record provides a "stable foundation" for an award substantially lower than that amount in the event the jury found plaintiff liable. Boyce, 464 F.3d at 392 (citation and internal quotation marks omitted).[17]

This conclusion is not inconsistent with the Court's denial of plaintiff's Rule 50 motion for judgment as a matter of law with respect to the tax liability issue. In denying that motion, the Court held that any uncertainty as to whether defendants would have in fact saved the full $500,000 claimed in damages in the event of a successful § 1031 transaction did not preclude a jury verdict awarding defendants the amount claimed. Nothing in that discussion, however, suggested that the jury could respond to any perceived uncertainty surrounding defendants' claimed damages amount by arbitrarily picking a number between zero and $500,000. Perhaps, if either party had introduced expert testimony or other evidence to provide a rational method of calculating a limited reduction in the claimed damages in view of the possibility that defendants would eventually have had to pay capital gains taxes on the South Dade transaction, there might be a basis to sustain the jury's reduced award. No such evidence, however, was introduced.

Tellingly, defendants' brief in opposition to plaintiff's motion does not cite a single piece of evidence that would provide a reasonable basis for an award above zero dollars but below $500,000. Instead, defendants reiterate several times their belief that the damages

---

[17] An award of more than zero dollars but less than $500,000 could not be justified based on the possibility — raised by neither party — that the jury found Exodus only partially at fault for the transaction's failure. Neither party requested a comparative fault charge, and the jury received no instructions on the issue. Defendants' South Dade claim, moreover, was based on a breach-of-contract theory (Tr. 1215), and the doctrine of comparative fault does not apply to contract claims. Solutia Inc. v. FMC Corp., 456 F. Supp. 2d 429, 451 (S.D.N.Y. 2006); Ahluwalia/Shetty v. Kidder, Peabody & Co., 93 Civ. 1261 (TPG), 1998 WL 122592, at *2 (S.D.N.Y. Mar. 18, 1998).

resulting from the transaction's failure totaled $500,000.  (D. Mem. 4, 7, 8, 14.)  The brief goes on to state that "[i]t is not clear that the jury awarded Cooke the $500,000" and that "[t]he jury award appears to have taken into consideration other elements of damages."  (Id.)  Defendants then assert, without citation, that "[e]ven if the $500,000 were a part of the jury's award, it was certainly within the jury's reasonable discretion to determine that some part of that expense . . . should be reimbursed to [defendants]."  (Id. 15.)  This is incorrect.  While juries may have wide discretion with respect to certain forms of damages, such as punitive damages (which are not at issue here), see Komlosi v. Fudenberg, 88 Civ. 1792 (HBP), 2000 WL 351414, at *17 (S.D.N.Y. Mar. 31, 2000), the jury in this case had no discretion to partially "reimburse[]" defendants absent any evidence whatsoever that defendants had been damaged in the amount reimbursed.

    If the jurors did not engage in speculation in setting the award, then the only plausible explanation for the reduction would be that they settled on a reduced amount by means of an illegitimate compromise verdict, meaning that "jurors with different views on whether defendant was liable" compromised by agreeing to find liability but also to award inadequate damages. Fox v. City Univ. of New York, 187 F.R.D. 83, 93 (S.D.N.Y. 1999) (citation and internal quotation marks omitted); see Patrick v. New York Bus Serv., Inc., 189 A.D.2d 611, 611-12 (1st Dep't 1993).  New York courts have long rejected verdicts as reflecting illegitimate compromises where the evidence has not provided any reasonable basis for the amount awarded, holding in many cases that the evidence presented required the jury to award either the full amount claimed or nothing at all.  See Marlio v. McLaughlin, 288 A.D.2d 97, 101 (1st Dep't 2001); Stachnik Marina, Ltd. v. Commercial Union Ins. Co., 263 A.D.2d 479, 480 (2d Dep't 1999); Cochetti v. Gralow, 192 A.D.2d 974, 975 (3d Dep't 1993); Ganz v. Hi-Line Co., 278

A.D. 761, 761 (1st Dep't 1951); Van Der Harst v. Koenig, 249 A.D. 235, 235-36 (1st Dep't

1936); Angresani v. Tozzi, 217 A.D. 642, 642-43 (1st Dep't 1926); Clark v. Foreign Prods. Co.,

194 A.D. 284, 285-86 (1st Dep't 1920); Seligman v. Linder, 117 N.Y.S. 192, 193 (App. Term

1909).

The Second Circuit has similarly held that courts may reject a verdict as compromised

where the question of liability is close and the verdict on damages is "inconsistent with the facts

adduced at trial." Atkins v. New York City, 143 F.3d 100, 104 (2d Cir. 1998). That is precisely

the case here. Even assuming that the jury credited Cooke's testimony, his failure to produce a

single tax return or any other form of documentary evidence supporting the tax claim made the

question of liability a close one. And, as noted above, an award of damages of less than

$500,000 is inconsistent with the only evidence defendants presented regarding the amount of

damages, that is, Cooke's testimony.

In sum, because there was no evidence to justify an award of damages for the failed

South Dade transaction that was more than zero dollars but less than $500,000, the Court cannot

accept the breach-of-contract verdict to the extent it includes a finding for defendants on the

issue of the South Dade transaction. Accordingly, the only portion of the "identifiable" damages

that could legitimately be included in the award for breach of contract was the $90,000 taken as

salary for Milam and Cormier.

C.  Unidentifiable Damages

In addition to requesting $696,666.67 in "identifiable" damages for breach of contract

and $380,000 in "identifiable" damages for breach of fiduciary duty, defendants asked the jury to

return to them a portion of the $313,000 that Exodus (and its principals) had been paid in

connection with the refinancing and sale of the Bronx properties, arguing that Exodus had not done the work entitling it to that money.[18]  (Tr. 1230.)  During summation, defense counsel did not provide any specific estimate as to what amount would compensate defendants for the damages suffered, asking the jury instead to return "whatever" amount they found appropriate based on the fact that Milam and Cormier had not fulfilled their contractual obligations.

Even assuming that defense counsel's summation did not invite the jury to engage in undue speculation or to pick an amount arbitrarily, defendants are not entitled to any portion of the $313,000 requested because the jury did not find a breach of any contract governing the money at issue.  Notably, defendants' brief in opposition to plaintiff's current motion does not argue that any portion of this $313,000 should be factored into the damages award.

Finally, in addition to the $1,076,666.67 requested in identifiable damages and the $313,000 requested as additional damages, defense counsel asked the jury "to determine that [defendants] [were] entitled to additional damages that might be shown by a full accounting." Defendants did not propose any figures, however; nor did they identify the source of these unknown damages.  Rather, defense counsel argued that there "may be other things" that caused

---

[18]  Defendants reached the $313,000 figure as follows: In their view, they were entitled to a substantial portion, if not all, of the $320,000 that Exodus received from the sale of the Bronx properties.  As discussed above, see Part II.B.1, they had already requested $106,666.67 of that amount in the form of "identifiable" damages, on the theory that Cooke was supposed to be a one-third participant in Exodus and receive one third of the $320,000.  In asking for additional damages beyond the $1,076,666.67, they sought "[w]hatever" portion of the remaining amount of the $320,000 — approximately $213,000 — that the jury found appropriate to return to them, on the theory that Milam and Cormier had not performed the contractual duties in a manner entitling them fully to a two-thirds share.  (Tr. 1230.)  In addition to this $213,000, defendants requested "whatever" portion the jury found appropriate to return from the $100,000 that Cooke had paid to Cormier and Milam from the refinancing proceeds pursuant to the parties' written agreement, also on the theory that Cormier and Milam had not performed their duties adequately. (Id.)

defendants damage but that defendants could not calculate the damages at that time.  (Tr. 1230.)[19]  However, the jury was not entitled to speculate as to any additional damages to add to the award based on these comments, given defense counsel's concession that the amount of additional damages could not be known without a "full accounting."

    D.   Total Amount of Awardable Damages for Breach of the AMA

Because the $500,000 award for the failed South Dade transaction and the $106,666.67 for the alleged breach of the Refinancing Agreements cannot be included in the total award for breach of the AMA, and because additional damages sought were either based on breach-of-contract claims that the jury rejected or involved amounts that defendant conceded could not be calculated without an accounting, the jury could not properly have awarded any sum above $90,000 for the breach of the AMA.  The award of $330,000 was therefore seriously erroneous, and the Court grants a remittitur of $240,000.  If defendants do not accept $90,000 as a damages award for the breach of the AMA, they are entitled to a new trial on that claim.  Furthermore, because the basis for the jury's $330,000 contract damages award is not known, and because the verdict was likely the result of an improper compromise on liability, a retrial would include the issue of Exodus's liability, as well as the issue of damages, with respect to the AMA claim.

Regardless of whether defendants elect a new trial, the Court will not disturb the jury's findings that (1) defendants did not breach the AMA, (2) defendants did not breach a fiduciary duty owed to Exodus, (3) plaintiff did not breach the Refinancing Agreements, and (4) the

---

[19]  Presumably, these unknown damages related in part to the alleged property mismanagement discussed at trial.  (See, e.g., 506-09, 652-57.)  Defendants have conceded that they do not seek damages for plaintiff's alleged failure to comply with audit requests.  (D. Mem. 16.)

plaintiff breached its fiduciary duty to defendants, causing damages of $380,000.

III.    Plaintiff's Motion for Sanctions

Plaintiff moves for monetary sanctions against defendants pursuant to Federal Rule of Civil Procedure 37(d), claiming that defendants failed to produce certain documents in accordance with plaintiff's discovery requests, including Washington Mutual bank statements in Cooke's possession and documents related to an audit in the possession of Cooke's accountant. Indeed, not only did defendants fail to respond to the initial discovery request, but they failed to respond in a timely manner to a Court order *during trial* that they produce the material at issue during a weekend recess.  (See, e.g., Tr. 673-78, 751-54, 763-64.)

On the Thursday of the first week of trial, in response to a request by plaintiff, the Court unambiguously instructed defendants to produce over the weekend *anything* in defendants' control that should have been produced during discovery.  (Id. 676-77.)  The next day, a letter faxed by plaintiff to defendants and the Court made clear that the discovery request included "all previously non-produced documents in [defendants'] possession or control responsive to *any* of plaintiff's document requests, including, but not limited to, all documents provided by plaintiff to Charles Mbamara."  (P. Letter of 4/21/06 at 1.)  Defense counsel faxed a response later that day, "recogniz[ing] and agree[ing]" that plaintiff was entitled to the documents requested.  (D. Letter of 4/21/06 at 1.)  The following Monday, however, the Court was forced to excuse the jury when Mbamara's testimony revealed that he had responsive documents in his possession that he had not produced over the weekend.  (Tr. 738-39.)  It became clear during the ensuing discussion, moreover, that the Court's discovery order had not been taken seriously.  Mbamara stated, for example, that even though defendants had asked him to produce certain documents

35

over the weekend, he could not recall when the request was made, because he "wasn't paying too much attention" and had "other things on [his] mind."  (Id. 744-45.)  He also testified that defense counsel had never asked him to look for all his documents relating to the audit of Exodus.  (Id. 748.)

As they did during trial, defendants concede in the post-trial briefing that certain documents were not produced when requested, but argue that sanctions are inappropriate because plaintiff was not harmed by the late production.  (D. Mem. 28.)  The materials at issue, defendants assert, were "originally in the Plaintiff's possession and control or actually created by the Plaintiff."  (Id.)

Rule 37(d) provides in relevant part:

> If a party . . . fails . . . to serve a written response to a request for inspection submitted under Rule 34, . . . the court in which the action is pending on motion may make such orders in regard to the failure as are just, and among others it may take any action authorized under subparagraphs (A), (B), and (C) of subdivision (b)(2) of this rule. . . . In lieu of any order or in addition thereto, the court *shall* require the party failing to act or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(d) (emphasis added).

Given defendants' conceded failure to respond adequately to discovery requests, and given the use of the word "shall" rather than "may" in the last sentence of Rule 37(d), the primary issue here is whether defendants' failures were "substantially justified" and whether there are "circumstances mak[ing] an award of expenses unjust."  Id.

Defendants do not argue that their discovery failures were justified, and there is no basis to find that an award of expenses, including attorney's fees, would be unjust under the

36

circumstances present here.  An October 2005 Order specifically warned that "any party that does not produce the necessary documents within the discovery period will be subject to sanctions."  (Order of 10/7/05.)   More importantly, defendants conceded at trial that they had failed in their discovery obligations and that plaintiff was entitled to the documents at issue. (Fleming Letter of 4/21/06.)  Despite this concession and despite an order from the Court directing defendants to produce the documents immediately, defendants *still* failed to comply with their obligations in a timely manner.[20]

Defendants contend that plaintiff suffered no prejudice from the late production of documents because the documents at issue were "originally in the Plaintiff's possession." (D. Mem. 28.)  Even assuming this is true with respect to some or all of the documents, however, defendants' argument misses the point.  Plaintiff sought the documents not to discover their content, but to demonstrate that Milam and Cormier had complied with defendants' audit requests by sending to Cooke and Mbamara the materials they demanded.  In any event, while prejudice is a relevant consideration in a Rule 37 motion, it is not a necessary condition to the imposition of sanctions.  See Fed. R. Civ. P. 37(d); Monaghan v. SZS 33 Assocs., L.P., 148

---

[20] Rule 37(d) also provides that "[a]ny motion specifying a failure under clause (2) or (3) of this subdivision shall include a certification that the movant has in good faith conferred or attempted to confer with the party failing to answer or respond in an effort to obtain such answer or response without court action."  Plaintiff has not submitted any such certification indicating that it attempted to confer with defendants on these issues during discovery.  It is not clear, however, that the certification requirement applies to post-trial motions.  In any event, even assuming the certification requirement applies, it is appropriate to waive that requirement here, because (1) defendants do not complain of any lack of certification in opposing plaintiff's motion for sanctions; (2) at least part of the discovery abuse occurred during trial, *after* the issues had been aired in open Court, *after* defendants had conceded that they were obligated to produce the documents, and *after* the Court had specifically ordered production; and (3) the Court had already advised defendants, in October 2005, that failure to respond to discovery requests would result in sanctions.

F.R.D. 500, 508 (S.D.N.Y. 1993); see also Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp., 602 F.2d 1062, 1066 (2d Cir. 1979) ("[C]ourts are free to consider the general deterrent effect their orders may have on the instant case and on other litigation, provided that the party on whom they are imposed is, in some sense, at fault.").

Accordingly, defendants are ordered to pay all of plaintiff's expenses, including attorney's fees, that were incurred as a direct and immediate result of defendants' failure to timely produce the Washington Mutual bank statements and audit-related documents to which plaintiff refers in its motion for sanctions.  The documents at issue include documents that were in the possession of Cooke as well as those in possession of Cooke's accountant, Charles Mbamara.  The expenses awarded shall include attorney's fees incurred in connection with the portion of the post-trial motion pertaining to plaintiff's request for sanctions.

Though the Court has discretion to impose additional sanctions, it declines to do so for a number of reasons.  First, there was no substantial prejudice to plaintiff.  Most, if not all, of the relevant documents were eventually produced; more importantly, plaintiff's counsel had an adequate opportunity to cross-examine Cooke and Mbamara regarding the failure to produce documents and the inconsistencies in their testimony regarding documents in their possession. (See, e.g., Tr. 603-04, 806-07.)  Second, the documents related to an issue for which neither party sought damages, namely, the audit requests.  Third, the discovery dispute at trial that led to the instant motion for sanctions likely could have been avoided in substantial part if plaintiff had actively pursued the unproduced documents before the close of discovery.  Late production may also have been avoided if plaintiff had chosen to depose Mbamara.

38

## IV.  Defendants' Cross-Motion for Sanctions

Defendants cross-move for sanctions.  Defendants do not specify the legal basis for the motion, and the factual basis is poorly defined.  The crux of defendants' argument appears to be that plaintiff's counsel conducted unnecessary depositions of Wallace and Corey Cooke. Though the depositions at issue were conducted by present counsel, defendants complain only of *former* counsel's behavior.[21]  Former counsel, however, has not been served or given an opportunity to respond.  In any event, defendants' motion is entirely without merit and will be denied.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for judgment as a matter of law is denied in its entirety, and plaintiff's motion for a new trial or remittitur is denied with respect to the fiduciary-duty claim.  Plaintiff's motion for a new trial with respect to the AMA claim is granted in part, and the Court sua sponte orders a remittitur to $90,000 on that claim.  On or before February 12, 2007, defendants may file with the Clerk of the Court an acceptance of the remittitur.  In the event defendants do not file an acceptance of the remittitur, a new trial on defendants' AMA claim will be scheduled by the Court.

Plaintiff's motion for sanctions against defendants is granted.  On or before February 5, 2007, plaintiff shall submit an affidavit, together with any necessary supporting documentation, setting forth the expenses to which plaintiff believes it is entitled in accordance with this Opinion and Order.  Defendants' cross-motion for sanctions is denied.

---

[21]  Defendants specifically state that current counsel, Silvia Serpe, acted reasonably throughout her involvement in this case.  (D. Mem. 29-30.)

SO ORDERED.

Dated: New York, New York
      January 16, 2007

                                        GERARD E. LYNCH
                                 United States District Judge